## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JODIE FARKAS,                          :
          Plaintiff          :      CIVIL ACTION
                        :
    v.                               :
                        :      NO. 1:15-CV-00356-CCC
NRA GROUP, LLC, individually           :
and d/b/a NATIONAL RECOVERY            :
AGENCY (NRA), ZULIAMA                   :
FIGUEROA, ALONZO                        :
HANKERSON, JESSIE MILES,                :
CRAIG ANDRUS, and                       :      JURY TRIAL DEMANDED
CHARLENE SARVER,                        :
          Defendants          :

## APPENDIX TO MOTION FOR SUMMARY JUDGMENT
## OF NRA GROUP, LLC, ALONZO HANKERSON,
## <u>CRAIG ANDRUS AND CHARLENE SARVER</u>

Jennifer E. Will
PA 84824
Lee E. Tankle
PA 315783
McNees Wallace & Nurick LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108
(717) 237-5418
(717) 260-1758 *facsimile*
jwill@mwn.com

*Attorneys for Defendants NRA Group,*
*LLC d/b/a National Recovery Agency*
*(NRA), Alonzo Hankerson, Craig*
*Andrus, and Charlene Sarver*

Date: January 15, 2016

Contents

Exhibit A            Plaintiff Jodie (Farkas) Elizabeth Curry Deposition
                     Transcript

                     pp. 7-9, 17-18, 20-25, 28-29, 41-42, 44-46, 48, 50, 52-63,
                     65-83, 86-93, 95-101, 109-11, 114-16, 129-131, 140-42,
                     155-58

                     ex. 2, pp. 1-3, 18; ex. 6, p. 1

Exhibit B            Affidavit of Ashley Chille

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
JODIE FARKAS,                    :
          PLAINTIFF              :
                                 :
     VS                          :  NO. 1:CV-15-356-CCC
                                 :
NRA GROUP LLC, individually      :
and d/b/a NATIONAL RECOVERY      :
AGENCY ("NRA"), et al.,          :
          DEFENDANTS             :
```

DEPOSITION OF:      JODIE ELIZABETH CURRY

TAKEN BY:           DEFENDANTS

BEFORE:             TERESA K. BEAR, REPORTER
                     NOTARY PUBLIC

DATE:               NOVEMBER 19, 2015, 10:18 A.M.

PLACE:              McNEES, WALLACE & NURICK
                    100 PINE STREET
                    HARRISBURG, PENNSYLVANIA

1    break while a question is pending.  I will insist

2    that you answer the question before you take a break.

3    Okay?

4       A      Yes.

5       Q      All right.  Are you taking any drugs or

6    prescription medications that might impact your

7    ability to testify truthfully today?

8       A      No.

9       Q      Okay.  Are you taking any that might

10   affect your memory?

11      A      No.

12      Q      Okay.  Have you suffered any recent

13   traumatic events that might affect your ability to

14   testify truthfully today?

15      A      No.

16      Q      Okay.  Do you have any physical or

17   mental condition that might impact your ability to

18   remember or to testify?

19      A      No.

20      Q      Okay.  Can you give me your full name

21   for the record.

22      A      Jodie Elizabeth Curry.

23      Q      And that is a different name than is on

24   the complaint?

25      A      Yes.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

Page 8

1    Q       Are you recently married or divorced?

2    A       Married, yes.

3    Q       Okay.  And have you formally changed

4  your name to Curry?

5    A       Yes.

6    Q       Okay.  Have you used -- other than Jodie

7  Elizabeth Curry and Jodie Farkas, have you used any

8  other names or aliases?

9    A       Angel.

10   Q       As a first name or a last name?

11   A       First name.

12   Q       Okay.  Was it Angel Farkas or Angel

13  Curry?

14   A       Farkas.

15   Q       Okay.  And did you officially change

16  your name from Angel Farkas to Jodie Farkas?

17   A       No.  Angel is a nickname.

18   Q       Okay.  Do you still use that nickname?

19   A       Yes.

20   Q       Okay.  Have you ever gone by any other

21  names?

22   A       No.

23   Q       Okay.  Have you ever gone by the name

24  Iliana?

25   A       No.  That is my biological name before

Page 9

1   adoption.

2        Q        Okay.  Can you give me your date of

3   birth.

4        A        2/7/1981.

5        Q        And your current address.

6        A        1917 Manada Street.

7        Q        And where is that?

8        A        Harrisburg, PA, 17104.

9        Q        And how long have you lived there?

10       A        Approximately six and a half months.

11       Q        Okay.  And where did you live before

12   that?

13       A        I lived at 12-D South Front Street,

14   Steelton, PA.

15       Q        Okay.  And how long did you live there?

16       A        Approximately five months.

17       Q        And before that?

18       A        2446 Walnut Street, Harrisburg --

19       Q        Harrisburg?

20       A        -- PA.

21       Q        Okay.  I won't ask you to go back any

22   further than that.

23                And you indicated you were recently

24   married.  When did that happen?

25       A        September 18th, 2015.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    Family and Medical Leave Act?

2        A        I was asking for FMLA time due to my

3    injury.

4        Q        Okay.  I'd like to direct your attention

5    to Count I.

6        A        Okay.

7        Q        Okay.  So you filed a willful

8    interference with and retaliation in violation of the

9    Family and Medical Leave Act against your former

10   employer, Golden Living?

11       A        Yes.

12       Q        Okay.  And is that similar to the claims

13   that you are raising in the instant lawsuit against

14   NRA?

15       A        No.

16       Q        Okay.  How are they different?

17       A        There was no verbal communication

18   through Golden Living and myself.  It was an injury

19   and terminated.  Not accepting my leave papers for

20   time off.

21       Q        Which?  Against Golden Living?

22       A        Yes.

23       Q        Okay.  Do you understand that in the

24   instant lawsuit you have also claimed that your

25   employer interfered with your rights under the Family

1    and Medical Leave Act?

2         A         Yes.

3         Q         Okay.  And you understand that you filed

4    an FMLA interference claim against Golden Living as

5    well?

6         A         Yes.

7         Q         Okay.  But you claim that those are

8    different counts?

9         A         Two different situations.

10        Q         Okay.  How are they different?

11        A         There was no -- not a lot of verbal

12   communication.  I was terminated --

13        Q         Okay.

14        A         -- immediately when putting my form in.

15        Q         Okay.  And in the situation with NRA

16   there was verbal communication and you have not been

17   terminated?  Is that how they're different?

18        A         Yes.

19        Q         Okay.  Do you contend that your claims

20   of retaliation against Golden Living and against NRA

21   are also different or are they the same?

22        A         They are different.

23        Q         Okay.  Can you explain how they are

24   different?

25        A         Golden Living retaliation was for a work

1           Let me ask it a different way.  How do

2   you believe Golden Living retaliated against you in

3   violation of the Family and Medical Leave Act?

4       A       By not giving me a chance to file for

5   FMLA, just termination.

6       Q       Okay.  So the termination, you believe,

7   was in retaliation?

8       A       For going for workers' compensation.

9       Q       Okay.  How do you believe NRA has

10  retaliated against you?

11          MR. FLANIGAN:  You know, I'm going to

12  ask that you and I step outside.  Maybe Lee has to

13  come with us.  We need to talk about something here.

14          MS. WILL:  Sure.

15          (Break taken at 10:38 a.m. until

16  10:39 a.m.)

17  BY MS. WILL:

18      Q       Have you ever been a party to any other

19  legal actions besides the employment litigation

20  against Golden Living?

21      A       Could you please clarify?

22      Q       Have you ever appeared before a judge or

23  a district justice or a magistrate judge?

24      A       Yes.

25      Q       Okay.  Can you tell me about those?

1    A        Approximately back in 2005.

2    Q        Okay.  What happened in 2005?

3    A        I had a DUI.

4    Q        Okay.  And you had to appear in court?

5    A        Yes.

6    Q        Okay.  And what was the result of that?

7    A        I was put on probation, fined.

8    Q        So you were ticketed or did you plead

9  guilty?

10   A        I pled guilty.

11   Q        And did you pay those fines and that

12  case is resolved?

13   A        Yes, I paid fines.

14   Q        Okay.  Any other times?

15   A        Approximately back in 2011.

16   Q        Okay.  Can you tell me what happened in

17  2011?

18   A        I have a movable probable cause.  I was

19  driving a friend to her boyfriend's house to get some

20  belongings.  And due to that time, she picked up

21  something off the lawn she should not have and put it

22  in my car along with her belongings.  We were stopped

23  by the police two seconds later.

24   Q        Okay.  And were you arrested or ...

25   A        Yes, due to the fact she took a -- the

1    lawn ornament off the lawn.

2        Q        Okay.  And what were you charged with?

3        A        Movable probable cause.

4        Q        Is it possible you were charged with

5    theft by unlawful taking?

6        A        They stated movable probable cause to

7    me.

8        Q        Okay.  And did you enter a guilty plea?

9        A        Yes.

10       Q        And, again, were there fines or

11   probation or anything associated with that?

12       A        There was a small fine and probation.

13       Q        Okay.  And is that resolved or are you

14   still on probation?

15       A        That is resolved.

16       Q        Anything else?

17       A        No.

18       Q        Are you sure?

19       A        Yes, I'm sure.

20       Q        Okay.  Did you plead guilty to

21   harassment in 2002?

22       A        I do not recall.

23       Q        We may come back to that.  I think we

24   have a document indicating that you pled guilty to

25   harassment in 2002.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    Have you ever -- have you been involved

2    in any other civil or criminal proceedings, aside

3    from the workers' comp, the claim against Golden

4    Living, the DUI, the movable property, and I think

5    that's all?

6    Have you ever been in court or before a

7    magistrate for any other legal proceedings?

8    A    Yes.

9    Q    Okay.  Can you tell me about those?

10    A    Approximately 2001.

11    Q    Okay.  And what was that?

12    A    My daughter's father and I went through

13    a PFA.

14    Q    Okay.  And who was that?

15    A    His name?

16    Q    Um-hum.

17    A    David Mosley.

18    Q    Okay.  And was the PFA against you or

19    was the PFA against Mr. Mosley?

20    A    Against myself.

21    Q    Okay.  So he filed a PFA against you?

22    A    Yes.

23    Q    Okay.  And did you ever violate the PFA?

24    A    They counted it as a violation when he

25    called me over to his house.

1    Q       Okay.

2    A       And I went, not knowing it was a setup.

3    Q       Did you plead guilty or was it a civil

4  matter?

5    A       I'm not quite sure what they would rate

6  that as in the court of law.

7    Q       Is that the possible 2002 harassment

8  claim?

9    A       It may be.  I cannot recall, though.

10   Q       Okay.  Anything else?

11   A       I have had a PFA on someone before.

12   Q       Okay.  And who was that?

13   A       My baby's father.

14   Q       And who is that?

15   A       Deon Jenkins.

16   Q       And which child?

17   A       Allure Farkas.

18   Q       And had you -- did you have to appear in

19  court on that?

20   A       Yes.

21   Q       Okay.  Can you tell me about that and

22  when it was.

23   A       Approximately 2002.

24   Q       Okay.  Ever involved in any legal

25  proceedings over failure to pay rent?

Page 25

| | | |
|---|---|---|
| 1 | A | I have -- yes. |
| 2 | Q | Can you tell me about that. |
| 3 | A | District justice. |
| 4 | Q | Okay.  And how did that resolve? |
| 5 | A | I worked out a payment arrangement with |
| 6 | the agency. | |
| 7 | Q | Okay.  And when was that? |
| 8 | A | Approximately 2013. |
| 9 | Q | Any other legal proceedings that you've |
| 10 | been involved in? | |
| 11 | A | Not that I can recall. |
| 12 | Q | Are you sure? |
| 13 | A | Not that I can recall. |
| 14 | Q | Okay.  What about litigation over unpaid |
| 15 | taxes? | |
| 16 | A | Not that I can recall. |
| 17 | Q | Do you know if charges were ever filed |
| 18 | against you for failing to file a tax return? | |
| 19 | A | I do not know that. |
| 20 | Q | I'm going to show you a document and see |
| 21 | if that refreshes your memory. | |
| 22 | A | (Reading.) |
| 23 | Q | Do you recall that? |
| 24 | A | I do not remember this. |
| 25 | Q | Okay.  Do you pay your income taxes? |

1            MS. WILL:  As I indicated, we got a pile

2   of documents.  If you would like to take a look at it

3   and tell me there was a response to Number 8 -- I

4   don't have it and I certainly don't have any tax

5   returns.

6            MR. FLANIGAN:  Okay.  Well, I'm going to

7   object to any tax returns and that will be -- if push

8   comes to shove, it will be motion practice.  My

9   clients do not produce tax returns.

10  BY MS. WILL:

11     Q       So you did not produce your tax returns

12  that your client -- at your attorney's direction?

13            MR. FLANIGAN:  Well, if she did produce

14  them to me, I'm not producing them because they're

15  privileged.

16            MS. WILL:  Okay.  I think we will be in

17  motion practice over that.

18  BY MS. WILL:

19     Q       Any other civil proceedings that you

20  have been involved in?

21     A       Not that I can recall.

22     Q       Okay.  Any actions involving South Side

23  Elementary School?

24     A       Yes.

25     Q       Okay.

1       A       District justice.

2       Q       Can you tell me about that?

3       A       My daughter was late to school a couple

4    times and I got a fine due to that --

5       Q       Okay.  How many times?

6       A       -- at the scene.  I do not recall.

7       Q       Okay.  And your plea in that case?

8       A       Guilty.

9       Q       Okay.  Is that the only one?

10      A       That I can remember, yes.

11      Q       Do you remember the year of that?

12      A       No, I do not.

13      Q       Okay.  Did that only happen once?

14      A       That I went in front of a judge --

15   district justice for her --

16      Q       Um-hum.

17      A       -- at South Side?  As I can -- I do not

18   recall.

19      Q       All right.  I'm going to show you three

20   different docket numbers involving South Side

21   Elementary.  Is it possible that it happened three

22   times?  The docket numbers are at the top.

23      A       Yes, that is possible, but I did not

24   recall until I just saw the documents.

25      Q       Okay.  Any others?

1   questioning as not relevant, neither factually nor

2   legally.

3             And, further, I'm going to motion the

4   court to strike all testimony up to this point,

5   except what the court determines is factually or

6   legally relevant.

7             MS. WILL:   I await your motion and we'll

8   respond to the same.

9             MR. FLANIGAN:   Okay.

10  BY MS. WILL:

11     Q        Okay.  So Billy Smith told you NRA was

12  hiring and you saw the place as you drove by in your

13  cab.  What made you apply?

14     A        To get a sit-down office job.

15     Q        Okay.  And when were you hired by NRA?

16     A        Approximately March 3rd, 2013.

17     Q        Okay.  And what is your current job

18  title?

19     A        Currently I am a debt collector.

20     Q        Not a dialer collector, which I believe

21  is what is referenced in your complaint?  I just want

22  to correct that.  It's a debt collector, that's your

23  position?

24     A        Yes.

25     Q        Okay.  And what are your current duties?

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      A          Taking inbound and outbound calls and

2    recovering money that is owed for different agencies.

3      Q          Okay.  Anything else?

4      A          Checking emails, checking voice mails.

5    That's basically it.

6      Q          Okay.  And who is your current

7    supervisor?

8      A          Jacqueline Rivera.

9      Q          And how long has Jacqueline been your

10   supervisor?

11     A          For approximately -- since May 8th of

12   2014.

13     Q          Okay.  And what is your rate of pay?

14     A          $11 an hour.

15     Q          Okay.  And are you eligible for bonuses?

16     A          Yes.

17     Q          And do you actually receive bonuses?

18     A          I used to.

19     Q          You no longer receive bonuses?

20     A          I haven't recently.

21     Q          Okay.  Why?

22     A          Due to being demoted and transferred to

23   another one of the locations at NRA.

24     Q          And when did that happen?

25     A          Approximately on May 7th, 2014.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      A        -- the amount.

2      Q        Can you give me an approximation?

3      A        It varies between $75 to $200.

4      Q        That was before May 7th, 2014?

5      A        Yes.

6      Q        So from 75 to 200 every two weeks?

7      A        Yes.

8      Q        Okay.  And you're saying that you've not

9   received any bonuses since May 7th, 2014?

10     A        No.

11     Q        What was your hourly rate --

12              MR. FLANIGAN:  I'm sorry, she said no --

13              MS. WILL:  I'm sorry.

14   BY MS. WILL:

15     Q        You have or you have not received

16   bonuses since May 7th, 2014?

17     A        No, I have not received bonuses since

18   May 7th, 2014.

19     Q        Okay.  Now, in response to your -- or in

20   response to our discovery requests, your attorney has

21   provided us with what appears to be a diary.  They're

22   marked Farkas pages 1 through 48.  And I'll put a

23   copy of that diary in front of you so that you can

24   refer to it.

25              MR. FLANIGAN:  Are you going to mark

1   this?

2              MS. WILL:  I'm not sure.

3              MR. FLANIGAN:  Okay.

4   BY MS. WILL:

5       Q         Then there were a separate two pages

6   that were marked Farkas 59 and 60.  Were these also

7   from your diary, or journal?  I'm not sure what you

8   call it.

9       A         No, this is not.  No.

10      Q         These are not from the same journal?

11      A         No.

12      Q         Okay.  Is it -- do you call it a

13  journal?  Do you call it a diary?  What is -- what do

14  you call this, just so --

15      A         Journal.

16      Q         Journal.  All right.

17      A         Yes.

18      Q         And this is your handwriting in the

19  journal?

20      A         Yes.

21      Q         Okay.  And did you write these things

22  down on the days that are referenced or did you write

23  it after the fact?

24      A         Wrote it --

25      Q         Were you keeping it at your desk and

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1  writing things down as they occurred or did you go

2  home and do it or did you do it weeks later, months

3  later?

4      A       It varied.  Sometimes in my car on break

5  and sometimes at home.

6      Q       Okay.  So the times referenced after

7  each date are not necessarily the time that you wrote

8  it down?

9      A       It is the time.  I notated on a small

10 piece of paper, put it in my purse and wrote the

11 journal in full length in my car or at home.

12     Q       Okay.  Let's start at the very first

13 entry.  Thursday, February 27th, 2014, 2:30 p.m.

14 Did you -- do you recall whether you wrote that at

15 2:30 or if you wrote it later?

16     A       I wrote that at 2:30.

17     Q       Okay.  When do you take your breaks?

18     A       It varies.

19     Q       Okay.  So you don't have an established

20 break time?

21     A       I did, but then I was told I could take

22 them as needed.  So it varied.

23     Q       Okay.  And you would go to your car?

24     A       Yes.

25     Q       Okay.  Why did you decide to start

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1          A          -- in the journal, but I wrote it on a

2     separate piece of paper on February 27th.

3          Q          Okay.  Did you keep this journal at the

4     office or did you keep it in your car?

5          A          I kept it at home.

6          Q          Okay.  And you just carried it with you

7     every day?

8          A          No.

9          Q          Okay.  Well, if you kept it at home, how

10    did you write it in your car on breaks?

11         A          I wrote on another piece of paper and

12    transferred it.

13         Q          Okay.  Did you transcribe it on the same

14    day that the things occurred?

15         A          Yes.

16         Q          Have you shared this journal with anyone

17    other than your attorney?

18         A          No.

19         Q          Okay.  Does this journal accurately

20    reflect your thought process regarding the events

21    described?

22         A          This journal accurately reflects what

23    happened on those days.

24         Q          Okay.  Or your recollection of the

25    events that happened during these days?

1    Q        Okay.  Do you still keep a journal?

2    A        No.

3    Q        Okay.  Why did you stop?

4    A        It got to be a lot with what I'm going

5    through and also the retaliation stopped.

6    Q        When did the retaliation stop?

7    A        The retaliation stopped after they got

8    notified of a lawsuit.

9    Q        Do you know when that was?

10   A        I do not recall exactly.

11   Q        The last entry I see in this document

12   that's been provided to us is May 8th, 2014.  Is that

13   when the retaliation stopped?

14   A        After the write-up situation, yes.

15   Q        Okay.  Did you provide your attorney

16   with the original of this or did you provide him with

17   this copy?

18   A        I provided -- I copied it.

19   Q        You copied it?

20   A        And sent it.

21   Q        Okay.  Where is the original?

22   A        At home.

23   Q        Would you provide your attorney with the

24   original so that he can make it available to us for

25   inspection?

Page 52

1   11:41 a.m.)

2            MS. WILL:   Back on the record.   I have

3   11:41.

4   BY MS. WILL:

5       Q       Okay.  We were at Count I.  You've had

6   an opportunity to review the complaint now?

7       A       Yes.

8       Q       Okay.  What does FMLA interference mean

9   to you?

10      A       FMLA interference means to me when

11  someone tries to detour you from taking FMLA.

12      Q       Just when someone tries to?

13      A       To detour you or interferes with you

14  taking FMLA.

15      Q       Okay.  And who tried to do that?

16      A       Alonzo Hankerson.

17      Q       And were you actually prevented from

18  taking FMLA?

19      A       I was given FMLA in the long run.

20      Q       Okay.  And what do you mean by "in the

21  long run"?

22      A       After going back and forth to his office

23  three times, I was given FMLA.

24      Q       Okay.  And that was all on March 3rd?

25      A       Yes.

1      Q      Okay.  Count II.  Discrimination with

2  discriminatory animus.  And, again, I know those are

3  legal terms of art, but what does that mean to you?

4      A      Discrimination with discriminatory

5  animus to me means when you -- when an individual has

6  something going on with them medically or when

7  they're not 100 percent and you don't treat them the

8  same way as you treat others.

9      Q      Okay.  And who did not treat you the

10 same as others?

11     A      Alonzo Hankerson.

12     Q      And how was that?

13     A      He wanted me to put my FMLA back in my

14 file and just get a doctor's note every time I was

15 going to call off.

16     Q      Okay.  And do you know how he treated

17 others who called off?

18     A      No, I do not.

19     Q      Okay.  Then how do you know you were

20 treated differently?

21     A      I was -- I was treated in a manner in

22 which if I'm filing for something I should not be

23 detoured from filing for it.

24     Q      But you were ultimately given FMLA?

25     A      Yes.

Page 54

1       Q        And you were ultimately given FMLA on

2   the same day that you asked for it, March 3rd?

3       A        Yes.

4       Q        Count III.  FMLA pretext discrimination

5   without discriminatory animus.  What does that mean

6   to you?

7       A        That you cannot discriminate against

8   someone.

9       Q        Okay.  And what does that mean?

10      A        Through race, creed, color.

11      Q        Okay.  Do you think you were treated --

12      A        Medical.

13      Q        Do you think you were discriminated

14  against because of your race or your creed or your

15  color?

16      A        No.

17      Q        Okay.

18      A        Or disability.

19      Q        Okay.  And have you filed a disability

20  discrimination claim?

21      A        With NRA?

22      Q        Yes.

23      A        No.

24      Q        Okay.  And Count IV.  FMLA retaliation.

25  What did that mean to you?

1      A        Retaliation means to me when someone

2   does something to you when you -- when they felt you

3   have done something wrong.  When they -- if you apply

4   for something and they retaliated against you in a

5   manner as harassment, embarrassing you, things of

6   that nature.

7      Q        Okay.  Let's go through the complaint.

8   All right.  Paragraph 1 of the complaint states that

9   you were subjected to a hostile work environment.

10          Are you saying that you were subjected

11  to a hostile work environment separate and apart from

12  your FMLA claim or is that intermingled with an FMLA

13  claim?

14     A        Could you please clarify?

15     Q        That's what I'm asking you to do.  It's

16  my understanding that a hostile work environment

17  claim is separate and apart from an FMLA claim and

18  I'm trying to understand if you are making a separate

19  hostile work environment claim or if that is

20  intermingled with your FMLA claims that we just went

21  through.

22     A        I do not know.

23     Q        Okay.  Paragraph 2.  I'm sorry, that's

24  still in Paragraph 1.  I'm sorry.  Still in Paragraph

25  1, nature of the case.  Four lines down you allege

1   that you were constructively discharged.  Can you

2   tell me what that means?

3       A       I was demoted from my position.

4       Q       Okay.  Do you understand what the words

5   constructive discharge mean in a legal sense?

6       A       Yes.

7       Q       Can you explain that for me?

8       A       Basically terminated.

9       Q       Actually, constructive discharge is a

10  legal claim where you assert that the conditions

11  became so terrible that you resigned your employment.

12             Is that what you meant to claim in this

13  lawsuit, that you had to resign from something?

14      A       No.

15      Q       Okay.  So what you intended to claim was

16  that you were demoted?

17      A       Yes.

18      Q       Okay.  So you were not constructively

19  discharged from NRA?

20      A       No.

21      Q       And you've consistently worked with NRA

22  since you were hired in 2013?

23      A       Yes.

24      Q       Okay.  All right.  Let's talk about that

25  demotion.  If you could turn to -- it looks like page

1   5, Paragraph 14.  You contend as a material fact that

2   you were promoted to debt collector supervisor in

3   August of '13.

4               MR. FLANIGAN:  Paragraph 15?

5               MS. WILL:  I'm sorry, October '13.

6      A        Yes, October 2013.

7   BY MS. WILL:

8      Q        Okay.  Do you contend that you were

9   actually a supervisor?

10     A        I contend I was a supervisor on the

11  supervisor line.

12     Q        Okay.  Did you supervise any employees?

13     A        No.

14     Q        Okay.  So you had no authority to hire,

15  fire or discipline employees?

16     A        No.

17     Q        Did any employees report to you?

18     A        No.

19     Q        Okay.  Could you assign any employees

20  any work?

21     A        No.

22     Q        Okay.  So you were promoted to debt

23  collector supervisor.  Exactly what is the debt

24  collector supervisor?  Can you explain that for me,

25  please?

1      A          Debt collector supervisor is a

2  supervisor who answers the supervisor line when an

3  irate consumer or individual would like to speak with

4  a supervisor and ask directly to speak with a

5  supervisor.

6      Q          Okay.  And you filled that role for some

7  period of time?

8      A          Yes.

9      Q          Okay.  But you were not actually a

10  supervisor?  You just answered the supervisor line

11  for when a consumer requested to talk to a

12  supervisor?

13      A          No.

14      Q          I'm not trying to be tricky.  I'm just

15  trying to understand.

16      A          No.  We were told that we were the

17  supervisors on the supervisor line.

18      Q          Okay.

19      A          When a consumer needed to talk to a

20  supervisor, the calls would be transferred to us and

21  we were to say we were a supervisor.

22      Q          Okay.  And when you got a call like

23  that, what were you supposed to do?

24      A          We were supposed to figure out what the

25  problem was with the consumer or the individual and

1    try to fix the problem in any manner, if it was in

2    our control.

3         Q         Now, if you took over a call from an

4    employee on a -- and you picked up on the supervisor

5    line and you found that the employee did something

6    wrong, did you have the ability to discipline them?

7         A         We would have to write it down and take

8    it to the collection manager.

9         Q         Okay.  And did you ever do that?

10        A         Yes.

11        Q         But could you issue a verbal counseling

12   to the employee or a corrective action?

13        A         No.

14        Q         Okay.  If somebody was doing a really

15   great job, could you recommend them for a raise or a

16   promotion?

17        A         No.

18        Q         Okay.  Were you ever asked to prepare

19   any performance evaluations of employees or anything

20   like that?

21        A         No.

22        Q         Okay.  And what was your compensation

23   for taking over the supervisor line or answering the

24   supervisor line?

25        A         An extra $50 biweekly.

1    Q       Okay. So $50 for every two-week pay

2  period?

3    A       Yes.

4    Q       Okay. And I believe you contend that

5  that designation was taken away on May 7th, 2014?

6    A       Yes.

7    Q       Okay. Since then, have you ever

8  expressed an interest in performing that duty again?

9    A       Yes.

10   Q       Okay. When?

11   A       I always wanted to perform that duty but

12 was told I could not do so after my write-ups.

13   Q       But I'm saying after it was taken away,

14 did you ever tell anyone that you would like to do it

15 again?

16   A       Yes.

17   Q       Okay. Who?

18   A       Jacqueline Rivera.

19   Q       When?

20   A       I do not recall the exact date.

21   Q       Okay. Approximate?

22   A       Approximately 2013.

23   Q       2013?

24   A       I'm sorry, approximately 2014.

25   Q       Okay. Can you give me an approximate

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    month?

2        A        It had to be sometime in May when I went

3    over there for the first time, to the other location,

4    and met with Jacqueline.

5        Q        Okay.  And what was Jacqueline's

6    response?

7        A        "You'll be okay, honey.  If things go

8    good, they might give it to -- back to you."

9        Q        Okay.  Did you ask anyone else?

10       A        No.

11       Q        Okay.  Did Jacqueline know anything

12   about your application for FMLA?

13       A        No.

14       Q        Okay.  Have you ever applied for that

15   position, if that's a process?

16       A        You don't apply for that.

17       Q        Okay.  How are people selected?

18       A        You are selected based on your job

19   performance and professionalism and referred by

20   supervisors.

21       Q        Okay.  Since May 2014, have you ever

22   asked Jacqueline to recommend you for that position?

23       A        Yes.

24       Q        Okay.  When?

25       A        In 2014.  I do not recall the exact

1    date.

2         Q        Okay.

3         A        I did bring it to her attention that I

4    would like to go back to that.  She stated they have

5    a lot of them at that location.

6         Q        Okay.  So you asked her when you first

7    got there in May and then some other time in 2014?

8    You asked Jacqueline twice?

9         A        During the same month, around the same

10   time.

11        Q        Okay.  So that all happened in May?

12        A        Yes.

13        Q        Okay.  But not since May of 2014?

14        A        No.

15        Q        Okay.  In Paragraph 15 of the complaint

16   you state that in or around August '13 you began to

17   suffer terrible migraine headaches.

18                 When did -- was your first migraine in

19   August of 2013 or had you been suffering from them

20   leading up to that?

21        A        I had started suffering from migraines

22   around August 2013.

23        Q        Okay.  When did you realize that they

24   were migraines or when were they diagnosed as

25   migraines?

1    A        In October 2013 -- around about October.

2    Q        And who diagnosed you?

3    A        Kline Family Practice.

4    Q        Do you remember the doctor's name?

5    A        No, I do not.  I have several.

6    Q        Okay.  Do you know whether Dr. Lorene

7  Mann diagnosed you as having migraines?

8    A        That name sounds familiar.

9    Q        Okay.  Do you know what -- or do you

10  recall what the physician said you should do about

11  your migraines?

12    A        I should lay down and take my

13  medication.

14    Q        Okay.  What medications?

15    A        Tramadol.

16    Q        Any others?

17    A        At that time, no.

18    Q        Okay.  Since then?

19    A        Topamax.

20    Q        And do you just take them when a

21  migraine is occurring or do you take them routinely?

22    A        Only as needed.

23    Q        Okay.  Do you still see Dr. Mann or

24  Kline Family Practice?

25    A        Yes.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      A        I --

2      Q        I don't know what "at my disposal" and

3      "available" means.  Do you have them in another

4      location where you could get them or you have no

5      medical records?

6      A        I have no medical records.

7      Q        Okay.

8               MS. WILL:  Can we go off the record for

9      a moment?

10              MR. FLANIGAN:  Sure.

11              (Discussion held off the record at

12     12:03 p.m. until 12:03 p.m.)

13              MS. WILL:  Back on.

14     BY MS. WILL:

15     Q        Okay.  Paragraph 16 of the complaint.

16     You state that Ms. Figueroa -- that you asked Ms.

17     Figueroa for FMLA paperwork; is that right?

18     A        Yes.

19     Q        Okay.  And did she give you the

20     paperwork?

21     A        Yes.

22     Q        Okay.  And did she give you any hard

23     time about that?

24     A        No.

25     Q        Okay.  Was she your supervisor?

1    A        She, at the time, was a collection

2   manager takeover.  Different positions changed for

3   different people all the time.

4    Q        Okay.  Did she supervise anyone?

5    A        Yes.

6    Q        Who?

7    A        The whole office of Crossgate -- at

8   Crossgate location.

9    Q        Okay.  Moving on in the complaint, the

10  paragraphs beginning with 17 on page 6.  I'm going to

11  show you your FMLA form.  Is this the FMLA form that

12  you handed to Alonzo Hankerson?

13   A        Yes.

14   Q        Okay.  And this indicates a Dr. Lorene

15  Mann filled it out; is that correct?

16   A        Yes.

17   Q        And you were seeking FMLA for migraines

18  that are not controlled?

19   A        Yes.

20   Q        Okay.  Are they controlled now?

21   A        No.

22   Q        Okay.  And this document was -- it looks

23  like it was signed by Dr. Mann on February 28th,

24  2014, correct?

25   A        Yes.

1    Q      Okay.  And did Mr. Hankerson read this

2  document in your presence?

3          When you gave it to him on March 3rd,

4  did he read it while you were there or did he look at

5  it while you were in his office?

6    A      No.

7    Q      Okay.  After Mr. Hankerson reviewed the

8  document, what did he tell you?

9    A      He told me that I can take all 12 weeks

10  of FMLA at once.

11    Q      Okay.  Did Mr. Hankerson appear to be

12  confused at all by this process?

13    A      Not until I brought it to his attention

14  that I thought I could take it as needed.

15    Q      Okay.  Was anyone else in the room while

16  you were communicating with Mr. Hankerson?

17    A      The first time, yes.

18    Q      Who was that?

19    A      Zuliama Figueroa.

20    Q      Was anyone else?

21    A      No.

22    Q      Why do you allege that Mr. Hankerson got

23  angry during your conversation?  Can you explain to

24  me what you mean by that?  Did he yell at you?

25    A      His tone of voice lifted and his body

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1   language and his voice was louder than regular

2   talking tone.

3       Q       Okay.  Would you call it a yell?  Would

4   you characterize it as a yell or screaming or ...

5       A       Loud tone.  Not his normal tone.

6       Q       Is he normally soft spoken?

7       A       Yes.

8       Q       Okay.  Did he swear at you or anything

9   like that?

10      A       No.

11      Q       Okay.  Now, you said his body language

12  changed.  Did he make any threatening gestures or

13  anything like that?  What do you mean by that?

14      A       His eyes got wide and his eyebrows went

15  up.

16      Q       Okay.

17      A       And he started shaking his head.

18      Q       Okay.  So in your diary -- or in your

19  journal, you indicated that initially Mr. Hankerson

20  thought you had to take all 12 weeks at once and then

21  you corrected him and said you thought you could take

22  it intermittent.  Is that the chronology?

23      A       Yes.

24      Q       Okay.  And then what happened next?

25      A       And then he told me that since I have a

ee09fdf3-f5e1-4af4-a840-a7f956c89535

Page 69

1    condition that I cannot control, why don't I take

2    part-time work.

3        Q        Okay.  And then on paragraph -- or

4    page 3 of your journal --

5                MR. FLANIGAN:  Maybe we should have that

6    marked.

7                MS. WILL:  Yeah, I think we should.

8    You're right.  Could we have the journal marked as

9    Farkas 2.

10               (Journal Bates stamped Farkas: 000001 to

11   Farkas: 000047 produced and marked as Farkas Exhibit

12   Number 2.)

13   BY MS. WILL:

14       Q        You referenced that he suggested you

15   work part-time.  And then at the bottom of that first

16   paragraph on page 3 of your journal you say, "He then

17   told me he will look into how FMLA works and get back

18   to me if I was approved."

19               Does that -- does your journal indicate

20   that perhaps he didn't understand how FMLA worked?

21               MR. FLANIGAN:  She's referring to the

22   journal.

23               MS. WILL:  Correct.

24               MR. FLANIGAN:  Where?

25               MS. WILL:  Page 3, the bottom of the

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    second paragraph.

2    BY MS. WILL:

3        Q        "He then told me he will look into how

4    FMLA works and get back to me if I was approved."

5        A        Yes.

6        Q        Okay.  Is it possible, at least

7    according to your perception written down that day,

8    that he didn't seem to understand how FMLA worked?

9                 MR. FLANIGAN:  I'm going to object to

10   the word possible.

11                MS. WILL:  Well, these are his words.

12                MR. FLANIGAN:  I understand, but the

13   word possible is very vague.  Anything is possible.

14                MS. WILL:  Okay.

15   BY MS. WILL:

16       Q        From your language, was it your

17   understanding that Mr. Alonzo did not fully

18   understand how FMLA worked or whether you would be

19   approved?

20       A        After I stated I would not just write a

21   doctor's note --

22       Q        Okay.

23       A        -- and bring it in and I still wanted to

24   go ahead with filing for FMLA --

25       Q        Okay.

1      A       -- then he said he wants to look into

2   it.

3      Q       Okay.  And did he look into it?

4      A       Yes.

5      Q       And did he approve it?

6      A       Yes.

7      Q       And that all occurred on March 3rd?

8      A       Yes.

9      Q       Okay.  And you were approved to take

10  intermittent FMLA leave; is that correct, as needed?

11     A       Yes.

12     Q       Okay.  Were you ever denied the ability

13  to take intermittent FMLA when you requested it?

14     A       At first, yes.

15     Q       Okay.  Tell me about that.  Who?  Who

16  denied you the ability to take it at first?

17     A       Verbally Alonzo Hankerson.

18     Q       Can you tell me about that.

19     A       He told me that I can write a doctor's

20  -- get a doctor's --

21     Q       No.  I mean after your form was signed

22  and approved on March 3rd, anytime that you attempted

23  to take intermittent FMLA was it ever denied?

24     A       No.

25     Q       Okay.  Moving on in your complaint,

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1   Paragraph 25.  I think this begins a discussion of

2   Jessie Miles.  And as we indicated at the start of

3   this, we do not represent Jessie Miles and we don't

4   believe that Jessie Miles has ever been served with a

5   copy of the complaint.

6           Do you recall any event -- or the event

7   that you describe in Paragraphs 25 and 26 occurring

8   on March 21st, 2014?

9       A       Yes.

10      Q       What do you allege that Jessie Miles

11  said to you?

12      A       That I had to get all of my hours in for

13  the week or I will not get my bonus money.

14      Q       Okay.

15      A       If I call off FMLA one more time, I

16  won't get my bonus money if I don't have all 40 hours

17  for that particular week.

18      Q       Okay.  Did Jessie Miles specifically say

19  FMLA?

20      A       Yes.

21      Q       Okay.  Why is that not quoted in

22  Paragraph 26 of your complaint?

23      A       After she said you won't be getting your

24  bonus money and she said even if you call off for

25  FMLA.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    Q        So how did Jessie Miles know about your

2  FMLA use?  Did you tell Jessie that you were on FMLA?

3    A        Jessie Miles was my supervisor.  I had

4  to call her when I called off.

5    Q        Okay.  And did you tell her you were

6  calling off for FMLA?

7    A        Yes.

8    Q        Okay.  Did Jessie know that you had

9  fewer hours because you were out on FMLA on March

10  21st?

11    A        Yes.

12    Q        Okay.  And that's because you told her?

13    A        She knows because she looks at my

14  attendance for the week.  She was my supervisor.

15    Q        Okay.  Does your attendance sheet

16  indicate FMLA?

17    A        No, it just indicates that I was out of

18  the office.

19    Q        Okay.  And the quote that you have is,

20  "I hope you know that you need to have over 40 hours

21  this week to see your bonus money and if you don't

22  you won't be getting your bonus money."

23            Were you denied any bonus money for the

24  week that included March 21st?

25    A        For that week, no.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      Q       Okay.  But you did not have 40 hours

2   that week?

3      A       I did have 40 hours that week.

4      Q       You did.  How did you get 40 hours?

5      A       I worked 40 hours that week.

6      Q       Were there any weeks that you did not

7   work 40 hours and obtained a bonus?

8      A       Yes.

9      Q       Okay.  Did you suffer any financial loss

10  as a result of Jessie's statements to you on March

11  21st?

12     A       No.

13     Q       Okay.  Did you suffer any harm as a

14  result of the conversation with Jessie Miles?

15     A       No.

16     Q       Okay.  So she didn't discipline you or

17  anything like that?

18     A       No.

19     Q       Okay.  Moving on to Paragraph 27 of the

20  complaint.  Do you recall calling out on March 25th,

21  2014?

22     A       Yes.

23     Q       Okay.  Do you recall who you reported

24  off to?

25     A       First Jessie Miles.

1      Q        Okay.  And what did you tell Jessie?

2      A        That I could not make it in due to not

3   feeling well.  I'm taking FMLA.

4      Q        Okay.  So you did tell her FMLA?

5      A        Yes.

6      Q        Okay.  In your journal, on page 12, you

7   indicate that Jessie asked you to start calling

8   Zuliama to call off.  Do you recall that?

9      A        Yes.

10     Q        So at some point did you stop calling

11  Jessie and start calling Zuliama, if you --

12     A        Yes.

13     Q        -- were taking FMLA?

14     A        Yes.

15     Q        And did you tell Zuliama that you were

16  using FMLA when you were reporting off?

17     A        Yes.

18     Q        Okay.  And you -- back to your

19  complaint.  I'm sorry.  We are going to just keep

20  jumping back and forth between these documents.

21              And in Paragraph 27 of the complaint you

22  say Jessie Miles yelled at you.  Were there any

23  witnesses?

24     A        I don't know.

25     Q        Okay.  And, again, can you characterize

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      -- or describe for me why you characterized it as a

2      yell?  Did Jessie scream at you?  Did Jessie just

3      raise her voice like you indicated Alonzo did?

4          A          Yes, raised her voice loudly.

5          Q          Okay.  And based upon this conversation,

6      did Jessie Miles discipline you or take any

7      employment actions against you?

8          A          No.

9          Q          Okay.  Paragraph 28.  Can you just

10     explain that for me?  As I mentioned, we've not been

11     able to contact Jessie Miles so I've not been in

12     communication with her, but what is your basis for

13     stating in Paragraph 28 that on March 28th Jessie

14     Miles told you you had to get four more payments or

15     else you would have to go back to training in

16     retaliation for having taken FMLA?  Can you tell me

17     what happened that day?

18         A          Jessie Miles told me my payments were

19     low for that particular week.

20         Q          And were they?

21         A          Yes.

22         Q          Okay.  And why do you characterize those

23     comments as retaliatory?

24         A          Because I was almost at my goal for the

25     week.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      Q        Okay.  Almost?

2      A        Yes.

3      Q        Okay.  And did you actually have to go

4  through retraining as a result of that week?

5      A        No.

6      Q        Okay.  And, again, were you -- did

7  Jessie discipline you at all?  Were you -- did you

8  receive any corrective action for being low on your

9  payments on that week or anything like that?

10     A        No, because I spoke to Zuliama Figueroa

11  about it --

12     Q        Okay.

13     A        -- and she took care of the situation.

14     Q        Okay.  So you did not have to go back to

15  training?

16     A        No.

17     Q        Okay.  Paragraphs 29 and 30.  You're

18  describing a meeting that took place on April 9th,

19  2014 regarding all employees' payments for the week.

20              Do you recall that meeting?  Can you

21  describe it for me?

22     A        Yes.  We had a meeting with our team.

23     Q        Okay.

24     A        And Jessie Miles, our supervisor, she

25  told us we have to get our payments.  Even if we are

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    out on FMLA or on regular work schedule, we have to

2    get the goals and make up hours --

3        Q        Okay.

4        A        -- to everyone.

5        Q        How many people were in that room?

6        A        Approximately 11 or 12.

7        Q        Okay.  So every -- this message was

8    given to everyone?

9        A        Yes.

10       Q        Okay.  And did you speak to Jessie in

11   private after that meeting?

12       A        Yes.

13       Q        Okay.  Can you tell me about that

14   conversation?  Was anyone else present?

15       A        Yes.

16       Q        Who?

17       A        Zuliama Figueroa.

18       Q        Okay.  And were you disciplined at all

19   as a result of the meeting on April 9th, 2014?

20       A        No.

21       Q        Your salary wasn't reduced or anything

22   like that?

23       A        No.

24       Q        Could you turn to page 18 of your

25   journal.  And on page 18 of your journal you're

1   describing a situation that involved Charlene Sarver,

2   who is a Defendant in this lawsuit.  And as I read

3   this, you are informing Charlene of some of the

4   things that we've already discussed involving Jessie

5   Miles.

6           And at the bottom of page 18 you say,

7   "When I told Charlene what Jessie Miles has told me

8   she said none of that is correct, and if I had any

9   questions to call her on her work cellphone."

10          Did you ever do that?  If you got

11   information from Jessie Miles that you questioned,

12   did you reach out to Charlene Sarver?

13   A       No.

14   Q       Okay.  Do you think that Jessie Miles

15   was intentionally giving you wrong information?

16   A       Yes.

17   Q       Okay.  Why?

18   A       Due to the fact she was upset every time

19   I would not be in the office.  And when I would come

20   back, she would make it a point in her actions to let

21   me know that.

22   Q       Okay.  And how?

23   A       Yelling behind me, "Get your payments.

24   Jodie, you need enough hours.  You need 40 hours and

25   as many payments as everyone else."

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1          Q          Okay.  Did you ever hear her say

2    anything like that to anyone else?

3                     Did she ever yell, "Get your payments"

4    to the group or to anyone else in the group?

5          A          She stated, "Get your payments" to

6    everyone as a whole before, but she actually came up

7    behind me and yelled it.

8          Q          Okay.  Did Ms. Sarver give you her

9    cellphone number?

10         A          Yes.

11         Q          Okay.  And in the organizational

12   structure is Ms. Sarver above or below Ms. Miles?

13         A          Above.

14         Q          Okay.  Paragraphs -- beginning at

15   Paragraph 31.  In the next three paragraphs you talk

16   about Craig Andrus and his discussion with you

17   regarding a violation of the Fair Debt Collection

18   Practices Act.  Can you describe that conversation

19   for me that you had with Craig.

20         A          At that time Craig Andrus, on April

21   16th, 2014, came up to me and told me that I had sent

22   about 12 letters wrong.

23         Q          Okay.

24         A          And that was a FDCPA violation.

25         Q          Okay.  And did you receive any type of

1    formal discipline as a result of that?

2        A       No.

3        Q       Okay.  And were you trained to change

4    call back dates after sending a letter?

5        A       Yes.

6        Q       Okay.  And as a result of the

7    conversation with Mr. Andrus, were you disciplined or

8    was your salary reduced or did you suffer any

9    employment actions?

10       A       No.

11       Q       Okay.  And Paragraph 34.  It talks --

12   this begins a series of paragraphs discussing May

13   7th, 2014.  Paragraph 34(a) discusses a write-up for

14   March 17th.  Can you tell me about your discussions

15   involving the write-up in Paragraph 34(a)?

16       A       The first write-up -- I don't recall

17   exactly which write-up that was --

18       Q       Okay.

19       A       -- since there was three.

20       Q       Okay.  This is a correction action

21   report for an occurrence on March 17th, 2014

22   indicating that you were disciplined because a call

23   on that date was in violation of the Fair Debt

24   Collection Practices Act, specifically that you

25   incorrectly told a consumer that if the consumer set

1   up a payment arrangement through their checking or

2   savings account the account would be considered in

3   good standing and it would not be reported to a

4   credit bureau.

5             And it's the company's position or the

6   position on the corrective action report that that

7   information that you provided to the consumer was not

8   correct.  Does that refresh your recollection?

9        A       Yes.

10       Q       Okay.  What is inaccurate about this

11   correction report?  And I did include the copy that

12   included your notes, if that helps you.

13       A       I don't recall stating to him that it

14   would go on his credit report.  I recall him asking

15   me and I told him he'd be in good standing if he

16   would make a payment arrangement through a checking

17   or savings account.

18       Q       Okay.  Is there anything about the

19   description that's inaccurate?

20       A       "Ms. Farkas advises that this bill has

21   not yet been reported to the credit bureau" and

22   "consumer then asks if he sets up a payment plan will

23   this keep it from going on his credit report."  I

24   told them it would be in good standing.

25       Q       Okay.  So I'm asking is there anything

1    in the company's description of this call that's

2    inaccurate?

3         A         "Accounts in good standing are not

4    reported to the credit bureau," that portion.

5         Q         Okay.  If you could turn to page 38 of

6    your diary.  In the first full paragraph, at the end,

7    when you're talking about these write-ups you say,

8    "All of them were supposibly" -- I think that's

9    misspelled -- "FDCPA violations that I didn't

10   remember."

11              So you didn't remember it on the date of

12   the event, but you do recall it now as being

13   inaccurate?

14        A         No, I didn't remember at the time --

15        Q         Okay.

16        A         -- of the --

17        Q         Do you recall it better now?

18        A         I do not recall stating that he would be

19   reported to the credit bureau.

20        Q         Okay.  So as we stand here today, the

21   "accounts in good standing are not reported to the

22   credit bureau," that quotation mark, did you -- did

23   you say that to the consumer?

24        A         I don't recall saying that.

25        Q         Okay.  Is it possible that you said it?

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    at some time afterward?  Were you able to listen to

2    that call?

3        A        Yes.

4        Q        Okay.  So you heard the recording of the

5    call?

6        A        Yes.

7        Q        Okay.  And then you set forth your

8    belief that you didn't think you should be

9    disciplined?

10       A        Yes.

11       Q        Okay.  Farkas 4 is another corrective

12   action report.  This is a date of occurrence April

13   26, 2014.  Go ahead and take a minute to review it.

14   It was a discipline for failing to properly follow

15   guidelines related to handling a deceased consumer's

16   account.

17               MR. FLANIGAN:  Standing objection to

18   this, same as the other, Farkas 3, unauthenticated

19   double hearsay, at least double hearsay.

20   BY MS. WILL:

21       Q        Is this description accurate -- and,

22   again, did you listen to this call?

23       A        Yes.

24       Q        Okay.  And is the description accurate?

25       A        No, not all of it.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    Q        Okay.  What is inaccurate about it?

2    A        It states that I didn't advise the

3    consumer with the correct information when her son

4    had passed away.

5    Q        Okay.

6    A        She did not feel like speaking of that

7    at that time.

8    Q        How do you know?

9    A        She was crying profusely on the phone

10   and I asked her basically, you know, did you want to

11   talk about this now or later and she basically told

12   me she doesn't want to talk about it now and she

13   wants us to take the number out.

14   Q        Okay.  And if we listen to the call,

15   she's going to say that she doesn't want to talk

16   about this now?

17   A        I asked her if she wanted to talk about

18   this now.  She said no.  She was crying hysterically

19   on the phone through the call.

20   Q        Why didn't you include that in your

21   description, your response to the discipline?

22   A        Could you please clarify?

23   Q        That the woman did not want to hear

24   about the proper procedure and that is why you didn't

25   share it with her, because she was crying profusely.

1     A          I remember stating it verbally, but I

2     didn't write it on here.

3     Q          Okay.  And this is from Supervisor

4     Stephon Brown.  Did Stephon Brown know anything about

5     your use of FMLA?

6     A          Yes.

7     Q          Okay.  How did he know?

8     A          He -- anytime I would tell Jessie Miles

9     about -- asking her, you know, did they mark it for

10    FMLA, for my absence, he would ask me, "What do you

11    need to say," if she was busy, and I would tell him

12    because he was a supervisor.  He already knew about

13    my FMLA.

14    Q          So you personally told Stephon Brown

15    about your FMLA?

16    A          After he brought it up to me from Jessie

17    Miles, if she was busy.  And if she could not speak

18    to me, she sent him over to me.

19    Q          Okay.  And, again, was this one of the

20    corrective action reports that you referenced in your

21    journal that you didn't remember the call?

22    A          Yes.

23    Q          Okay.

24    A          Remember violating the FDCPA.

25    Q          I'm sorry, you didn't remember violating

1    the FDCPA.  Okay.

2              Paragraph 34(c).  This was the third

3    write-up.  And the date on this incident is May 1st,

4    2014.  Is it accurate that you disputed this

5    disciplinary notice as well?

6        A         Yes.

7        Q         Okay.  And you raised some concerns

8    about this?

9        A         Yes.

10       Q         And were those concerns investigated?

11       A         Craig Andrus looked at the computer

12   screen with me and brought it to Charlene Sarver's

13   attention.

14       Q         And this discipline was retracted?

15       A         Yes.

16       Q         Okay.

17       A         May I say something else?

18       Q         Sure.

19       A         It was retracted due to Stephon Brown

20   going in the account and changing my status.

21       Q         Okay.

22                 MS. WILL:  5.

23                 (Correction Action Report produced and

24   marked as Farkas Exhibit Number 5.)

25   BY MS. WILL:

1    Q        And that's why you were not disciplined?

2    A        After they -- after I showed it to them.

3    Q        Okay.

4    A        Yes.

5             MR. FLANIGAN:  Concerning Farkas 5, same

6    objections as Farkas 3 and 4.

7    BY MS. WILL:

8    Q        Moving on to Paragraphs 36 and 37.  Did

9    Charlene Sarver tell you that your supervisor

10   takeover line responsibility was being removed?

11   A        Yes.

12   Q        Okay.  And why -- what did she tell you

13   was the reason for that?

14   A        She just stated because of the write-ups

15   I was off of the supervisor line and having it taken.

16   Q        Because of the FDCPA violations?

17            MR. FLANIGAN:  Alleged violations.

18            MS. WILL:  Sure.

19   BY MS. WILL:

20   Q        Is that what she told you, that because

21   they found FDC -- what they concluded were FDCPA

22   violations that that's why your supervisor line

23   responsibility was being removed?

24   A        Because of the alleged violations, yes.

25   Q        Okay.  Why do you think that

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1   responsibility was removed?

2      A      Due to the fact that I would not be in

3   the office at all times and retaliation --

4      Q      Okay.

5      A      -- for taking FMLA.

6      Q      Do you have any proof that that was the

7   reason it was taken away?

8      A      Well --

9      Q      Or is it more of a hunch?

10     A      -- in the third write-up somebody went

11  in and framed me to make it look like I did something

12  that I did not do.

13     Q      How do you know they went in and framed

14  you?

15     A      I looked in the account.

16     Q      Okay.  And what exactly did you see that

17  makes you think they framed you?

18     A      My status change that I had originally

19  put was changed by Stephon Brown and the call back

20  date.

21     Q      Did you name Stephon Brown as a

22  defendant in this lawsuit?

23     A      No.

24     Q      Okay.  Any other proof -- and that was

25  the discipline that was ultimately rescinded,

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    correct?

2        A        Yes.

3        Q        Okay.  Any other proof that you lost

4    that title in retaliation for FMLA?

5        A        I remember calling off a couple days

6    prior to my write-ups and when I got back from leave

7    I was told to come into the office that late

8    afternoon.

9        Q        Okay.  Were you given the choice of

10   changing your shift or relocating to the Harrisburg

11   office?

12       A        They -- Charlene Sarver stated that but

13   already knew that I could not do second shift every

14   night.

15       Q        Okay.  How did she know that?

16       A        I wrote a letter to the company stating

17   that months prior.

18       Q        Okay.  Now, you say in Paragraph 36 of

19   your complaint that Charlene threatened you.  Why do

20   you say that?

21                Did she yell at you?  Did she threaten

22   you with any violence?  Did she scream at you?

23                What happened?  Why do you use the word

24   threaten?

25       A        She didn't want to hear anything I had

1   to say.  She just told me that since I can't do night

2   shift that I'm going straight over to Paxton Street

3   location and the supervisor line is taken.

4        Q        Okay.

5        A        She also stated that, "I could have

6   fired you way before you took your FMLA."

7        Q        Any witnesses?

8        A        Craig Andrus was present during the

9   write-ups.

10       Q        Was Craig Andrus present when you allege

11  Ms. Sarver said, "If I wanted to fire you, I could

12  have done it two months ago"?

13       A        Yes.

14       Q        Okay.  Can you explain to me why you

15  included Paragraph 38 in the complaint?

16       A        That was what was told to me by Craig

17  Andrus.

18       Q        Okay.  And how does that relate to your

19  FMLA claim?

20       A        I feel as though it was said to make me

21  think about the company and their policies and what's

22  best for them, regardless of what they're doing.

23       Q        Had Mr. Andrus made any comments like

24  that before you took FMLA, that you've got to look

25  out for the company and we're here to serve the

Page 95

1     A          After my grandmother's wake, yes.

2     Q          Okay.  Were you denied bereavement

3   leave?

4     A          Verbally, yes.

5     Q          Okay.

6     A          For June -- the day of my grandmother's

7   wake.

8     Q          And was that the day after you requested

9   it, June 5th?  You say on or about June 4th you

10  requested a bereavement day so that you could attend

11  your grandmother's wake.  Was the wake the next day?

12    A          I don't recall approximate dates at the

13  current time.

14    Q          But it's your contention that you were

15  denied a bereavement day?

16    A          Yes.

17    Q          Okay.

18    A          For her wake.

19    Q          And you don't know when the wake was?

20    A          I want to say approximately June 5th,

21  2014.

22    Q          Okay.

23               MS. WILL:  I'll have this marked as

24  Farkas 6.

25               (Timecard view and earnings statement

1    produced and marked as Farkas Exhibit Number 6.)

2    BY MS. WILL:

3        Q        Okay.  If I could direct your attention

4    to June 5th.  I see an earnings code of bereavement

5    and June 6th an earnings code of vacation.

6                So isn't it true that you were granted

7    both a day of bereavement and a day of vacation and

8    that you were, in fact, paid for both days?

9        A        I do not call exact -- recall exact

10   dates --

11       Q        Okay.

12       A        -- even with this form from NRA.

13       Q        Okay.  Page 2 of Farkas 6 is a copy of

14   your earnings statement, which I would like to read

15   into the record.  It reflects both a bereavement day

16   and a vacation day.

17       A        Okay.  May I say something?

18       Q        Sure.

19       A        The on or about June 4th, I requested it

20   before June 4th then.  June 4th is not the exact day

21   that I requested it.  I brought it to my supervisor's

22   attention before that.

23       Q        When?

24       A        I don't recall exactly when.  I want to

25   say -- an estimated time, earlier within that week.

1      Q        Okay.  Do you have any proof of that?

2      A        I wrote a slip, a PTO slip to the

3    company.

4      Q        Do you have a copy of that?  Did you

5    maintain a copy of that PTO slip?

6      A        Yes.

7      Q        Okay.  And it would have the dates?

8      A        Yes.

9      Q        Would you please provide that to your

10   attorney?  We requested all documents pertaining to

11   this lawsuit --

12     A        Yes.

13     Q        -- and clearly that pertains.

14              So it's your contention that Paragraph

15   39 of your complaint is inaccurate?

16     A        No, because it says on or about.  It's

17   or about.

18     Q        Did you request more than one

19   bereavement day or is that part of the complaint

20   accurate?

21     A        I requested one bereavement day.

22     Q        Okay.  That's accurate, you requested

23   one bereavement day?

24     A        Yes, requested one bereavement day.

25     Q        And you received one bereavement day?

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      A          Yes, received one bereavement day.

2      Q          Okay.  So is the sentence that says,

3  "Plaintiff was subsequently denied the day,"

4  inaccurate?

5      A          The day of my grandmother's wake I was

6  denied, yes.

7      Q          Okay.  So is it your contention that you

8  requested more than one bereavement day?

9      A          I requested a vacation day --

10     Q          Okay.

11     A          -- and a bereavement day.

12     Q          Okay.  And according to your earning

13  statement, you received a vacation day and a

14  bereavement day; is that accurate?

15     A          Yes.

16     Q          Okay.  So then the sentence in your

17  complaint that says, "Plaintiff was denied a

18  bereavement day in further retaliation," is that

19  incorrect?

20     A          No.

21     Q          Okay.  How is it correct?

22     A          I didn't receive my bereavement day on

23  the original day I wanted it so I took the day after

24  -- the next day.  So I guess it was the original day,

25  but I'd have to look at my PTO slip to see exactly

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    what I had asked for.

2       Q        Okay.

3       A        I don't remember.

4       Q        But we can agree that you requested one

5    day of bereavement and you received one day of

6    bereavement and you requested one day of vacation and

7    you received one day of vacation?

8       A        I didn't tell them how long a vacation I

9    was going to take at the time --

10      Q        Okay.

11      A        -- of my writing on my PTO slip.

12      Q        Okay.  Why?

13      A        I didn't know how long I would need to

14    mourn my grandmother's death.

15      Q        Okay.  Were you denied any vacation?

16      A        No.

17      Q        Okay.  Paragraph 40.  You say prior to

18    submitting FMLA paperwork you never received any

19    complaints or write-ups related to your work

20    performance.  Is that statement correct?

21      A        No.

22      Q        Okay.  So you had been disciplined prior

23    to submitting your FMLA paperwork?

24      A        Yes.

25      Q        Okay.  Can you tell me about those?

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      A        I remember one was before I was promoted

2   to the supervisor line for attendance.

3      Q        Okay.

4      A        I do not recall the date.

5      Q        Did you have problems with attendance

6   prior to your migraine diagnosis?

7      A        Occasionally.

8      Q        Any other disciplines?

9      A        I was disciplined for work performance

10  and for monthly goal amount and AP goal amount before

11  I was promoted to the supervisor line.

12     Q        Any others?

13     A        There was another write-up.  It had to

14  do with what was stated, that I didn't say the --

15  "all calls are recorded and may be monitored" during

16  a phone call for some type of an account with a bank,

17  but I did say "all calls are recorded and may be

18  monitored" on that call.

19     Q        Okay.  So let's go back to the

20  attendance one -- well, first, were there any others?

21     A        Not that I remember.

22     Q        Okay.

23              MS. WILL:  I'll actually have all three

24  of these submitted as a single exhibit.  Farkas 7.

25              (Correction Action Reports produced and

1    marked as Farkas Exhibit Number 7.)

2              MR. FLANIGAN:  I was wondering if we

3    could take a break before we get into these?

4              MS. WILL:  I'd like to get through these

5    first.  It shouldn't take long and then we can take a

6    break.

7              MR. FLANIGAN:  Okay.  You're up against

8    Mother Nature so you're under pressure.

9              MS. WILL:  I understand.  Off the

10   record.

11              (Discussion held off the record.)

12   BY MS. WILL:

13       Q       So Paragraph 40 of the complaint is

14   inaccurate, you had been disciplined at least three

15   times prior to FMLA?

16              MR. FLANIGAN:  Is that a statement or a

17   question?

18              MS. WILL:  That's a question.

19   BY MS. WILL:

20       Q       Can you confirm that?

21       A       Yes.

22       Q       Okay.  So, clearly, this discipline

23   could not be in retaliation for use of FMLA.  They

24   all predate the FMLA, correct?

25       A       Correct.

1      Q        Okay.  Did you ever go anywhere else?

2      A        I submitted intake paperwork to a

3  therapist on Derry Street.  I do not remember the

4  name at the time.

5      Q        Did you see that therapist?

6      A        No.

7      Q        Okay.  Has any physician indicated that

8  your anxiety was a direct result of any of the

9  Defendants' conduct in this lawsuit?

10     A        In my medical records there was a

11  mention at an appointment about what I was going

12  through at the company.

13     Q        Okay.  And who mentioned that?

14     A        I did.

15     Q        Okay.  So you explained it to your

16  physician.  Has any physician indicated that your

17  panic attacks or your anxiety were a direct result of

18  the conduct of Defendants?

19     A        No.

20     Q        Okay.  Is there anything else in your

21  life that is causing you anxiety?

22     A        More anxiety than what I went through

23  before?

24     Q        Okay.

25     A        Yes.

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      Q        Okay.  And what is that?

2      A        Can I take a break?

3               MR. FLANIGAN:  You want a break?

4   BY MS. WILL:

5      Q        I'd like you to answer this question

6   before you take a break.

7               MR. FLANIGAN:  Yes, you do have to

8   answer the question and then you can take a break.

9               Can you repeat the question?

10  BY MS. WILL:

11     Q        Is there anything else going on in your

12  life that is causing you anxiety and/or panic

13  attacks?

14              MR. FLANIGAN:  Related to work?

15              MS. WILL:  No, unrelated to work.

16     A        My sister's death.

17  BY MS. WILL:

18     Q        And when was that?

19     A        January 11th.

20     Q        Of this year?

21     A        Of this year.

22     Q        Okay.

23              MR. FLANIGAN:  We're going to take a

24  break.

25              MS. WILL:  We'll go off the record,

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    yeah.  I'm going to ask that you not discuss any of

2    the testimony that she's already given while we're on

3    a break.

4             MR. FLANIGAN:  Well, you can ask.

5             (Break taken at 1:35 p.m. until

6    1:38 p.m.)

7             MS. WILL:  Back on the record.

8    BY MS. WILL:

9        Q       Aside from your sister's death in

10   January of this year, any other incidents in your

11   life that contribute to your experience of anxiety

12   and/or panic attacks?

13       A       I'm sorry, could you repeat the

14   question, please?

15       Q       Sure.  Aside from your sister's death,

16   are there any other events in your life that have

17   contributed or caused anxiety or panic attacks, aside

18   from work and aside from your sister's death?

19       A       No.

20       Q       Okay.  So nothing involving the PFAs or

21   your children or their fathers?

22       A       No.

23       Q       Okay.  How often do you take the anxiety

24   medicine?

25       A       As needed.

1   supervisor telling me that I have to get, you know,

2   all my payments and -- in 2014, as well, I went

3   through a period of time where I wrote a letter to

4   the COO of the company, Shell Sharma, and I felt like

5   nobody was responding to anything I was asking within

6   the letter or just general questions I had.  I felt

7   like they were ignoring me.

8              So I just had some anxiety attacks and I

9   left work early because it gave me a migraine as

10  well.

11     Q       Okay.  What physical or emotional

12  ailments do you allege have been caused by Alonzo

13  Hankerson?

14     A       Could you repeat the question one more

15  time?

16     Q       What physical ailments or emotional

17  distress do you feel has been caused by Alonzo

18  Hankerson?

19     A       I feel as though he has made me have no

20  trust toward human resources or -- I can't -- I could

21  not trust him.

22     Q       And how has that manifested in physical

23  or emotional terms?  You've claimed physical ailments

24  and emotional distress.

25     A       It --

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    Q        And I am trying to understand what you

2  believe is directly related to Defendant Hankerson.

3    A        Some of the anxiety.

4    Q        Same question for Charlene Sarver.

5    A        A part of the anxiety.

6    Q        Same question for Mr. Andrus.

7    A        Anxiety.

8    Q        Okay.  Has any physician ever said that

9  -- or therapist, or anyone who has treated you, said

10 that your anxiety is directly related to Mr.

11 Hankerson?

12   A        No, not related to Mr. Hankerson, but to

13 the job.

14   Q        Okay.  So you have -- you believe that a

15 physician has said your anxiety is related to your

16 job?

17   A        Yes.

18   Q        Okay.  And which physician is that?

19   A        I forget his name.  He was the only male

20 physician I saw at Kline Family Practice.

21   Q        Okay.  Same question for Sarver.  Has a

22 medical professional rendered an opinion that your

23 anxiety was directly caused by Ms. Sarver?

24   A        Not directly by Ms. Sarver but by the

25 actions of the company, yes.

Page 116

1      Q        Okay.  Same question for Mr. Andrus.

2      A        By the actions of the company, yes --

3      Q        Okay.

4      A        -- these individuals.

5      Q        And this is a male doctor at Kline?

6      A        And a female doctor.  I see -- I saw

7    three different ones.

8      Q        Okay.  Did you ever experience any

9    symptoms of anxiety or depression prior to March of

10   2014?

11     A        When I was young, I had clinical

12   depression.

13     Q        Okay.  And what do you mean by young?

14     A        A teenager.

15     Q        And were you medicated at that time?

16     A        Yes.

17     Q        Okay.  And when did that stop?

18     A        When I was 17.

19     Q        Okay.  So by the time you were 17, your

20   anxiety was resolved -- or your depression was

21   resolved?

22     A        Yes.

23     Q        Okay.  And how old are you now?

24     A        34.

25     Q        Okay.  At any time between 17 and -- I

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    Q       I'd like to ask some specific questions

2  about the individual Defendants now.  You've named

3  Craig Andrus as an individual Defendant in his

4  personal capacity.  Was he your supervisor?

5    A       He is a training -- was a training

6  manager.

7    Q       Okay.  Did he have the ability to fire

8  you or discipline you?

9    A       I don't know.

10   Q       Okay.  Did he tell you what hours to

11 work?

12   A       No.

13   Q       Did he have the authority to give you a

14 raise?  Did he set your salary?

15   A       I don't know what he had authority to

16 do.

17   Q       Did he ever communicate with you

18 regarding your salary?

19   A       No.

20   Q       Okay.  What about your schedule?

21   A       No.

22   Q       Did he have any influence over your

23 bonus?

24   A       I do not know.

25   Q       Okay.  Did he ever complete a

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    performance evaluation for you?

2        A        No.

3        Q        Okay.  Did he ever assign you work to

4    perform or give you accounts?

5        A        No.

6        Q        Okay.  What about Charlene Sarver?  Was

7    she your supervisor?

8        A        She was the supervisor of the whole

9    collection agency, the dialer floor manager.

10       Q        So did she have the ability to set your

11   schedule and tell you what hours to work?

12       A        Yes.

13       Q        Okay.  Did she have the ability to set

14   your salary or make adjustments to your salary?

15       A        I don't know.

16       Q        Okay.  Did she ever complete your

17   performance evaluation?

18       A        No.

19       Q        Okay.  Did she have the authority to

20   fire you?

21       A        Yes.

22       Q        Do you know if she had ever fired anyone

23   else?

24       A        I do not know.

25       Q        Did she assign you work to perform?

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1      A          She assigned the campaigns to get in,

2   yes.

3      Q          Okay.  What do you mean by that?

4      A          She told the supervisors what campaigns

5   to put their team in.

6      Q          Okay.  But she didn't specifically

7   assign campaigns to you?

8      A          No.

9      Q          Okay.  And Alonzo Hankerson, was he your

10   supervisor?

11      A          No.

12      Q          Did he have the ability to fire you?

13      A          I do not know.

14      Q          Okay.  How about control your work

15   schedule?

16      A          I do not know.

17      Q          Okay.  How about influence your salary

18   or give you a raise or a decrease?

19      A          I do not know.

20      Q          Okay.  Did he ever assign you work to

21   perform?

22      A          No.

23      Q          Okay.  Since you filed your lawsuit,

24   have you looked for work anywhere else?

25      A          No.

1    discretion of the company?

2        A        Yes.

3        Q        Okay.  And at the very top of the second

4    page it states, "Employees may not be eligible for

5    the incentive plan if there are violations of

6    federal/state law and/or company policy;" is that

7    correct?

8        A        I've never seen that in there.

9        Q        Okay.  But you have been disciplined

10   twice for violations of the Fair Debt Collection

11   Practices Act, correct?  I know you disputed one of

12   them, but you have been disciplined twice?

13       A        Yes, but I didn't think that stopped me

14   from bonusing if I did bonus.

15       Q        Okay.  Have you received any bonuses

16   since you transferred to Paxton?

17       A        One, if I -- one small bonus.

18       Q        Okay.  And do you know if that was a

19   leftover from when you were at Crossgate?

20       A        No, that was for Paxton.

21       Q        Okay.  Throughout your complaint you

22   have stated that Defendants' conduct has been

23   malicious, willful, outrageous, and conducted with

24   full knowledge of the law and oppressive.  Can you

25   explain to me what conduct you found to be malicious?

1     A          I do not recall the exact date when

2  Alonzo Hankerson called me into the conference room

3  at Paxton Street --

4     Q          Okay.

5     A          -- and told me at that time that my FMLA

6  has expired, that my time is up, that I cannot take

7  any more FMLA days.

8     Q          Okay.

9     A          I questioned it.  So Alonzo Hankerson

10 and Charlene Sarver and myself went -- closed the

11 door and I asked to call -- Alonzo Hankerson stated

12 to me that my doctor had told him that I filled out

13 the FMLA paperwork myself.  So I wanted to call my

14 doctor in front of both of them to verify what was

15 said.

16    Q          Okay.

17    A          And which I did.

18    Q          Okay.

19    A          And they stated at my doctor's office

20 that they never told Mr. Hankerson that.

21    Q          Okay.  Anything else that you contend is

22 malicious?  Before I move off of that question, had

23 your FMLA actually expired?

24    A          No.

25    Q          Okay.  Were you permitted to continue to

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1   take FMLA?

2       A       Yes.

3       Q       Okay.  Anything else that you contend

4   was malicious?

5       A       But I needed another recertification

6   form --

7       Q       Okay.

8       A       -- filled out.  He said now I have to

9   get more detail for him.

10      Q       Okay.  And did you get a recertification

11  form?

12      A       Yes.

13      Q       Okay.  Anything else that you contend is

14  malicious?

15      A       Just the way Alonzo Hankerson stated,

16  "Jodie, you have a daughter.  Why don't you put your

17  FMLA paperwork back in your file and you can just

18  call off with a doctor's note anytime you want to

19  call off FMLA."

20      Q       Okay.  Anything else?

21      A       Just with the people that are present,

22  correct?

23      Q       You tell me.

24      A       Jessie Miles' comments, yelling, "Get

25  your payments," telling me I would go back in

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    you said that -- in reference to your complaint that

2    your migraines are debilitating and when you get one

3    it lasts the whole day?

4        A        It can last up -- it can last the whole

5    day or -- I get them one to two days a week.

6        Q        Okay.

7        A        And it can last up to the whole day.

8        Q        Okay.  But would you agree that in your

9    original certification, Farkas 9, your doctor said

10   that the duration is only three or four hours?

11       A        Three to four at that time, but then it

12   went up to more than that later.

13       Q        Okay.  And do you understand that under

14   the FMLA your employer has the right to request a

15   recertification?

16       A        Yes.

17       Q        Okay.  So if your absences were of a

18   full day, they might request a clarification or a

19   recertification; is that correct?

20       A        Yes.

21       Q        Do you understand?  Okay.  I'm going to

22   show you what I'll mark as Farkas 10.

23                MR. FLANIGAN:  11.

24                MS. WILL:  11.  Thank you.

25                (FMLA form produced and marked as Farkas

1    Exhibit Number 11.)

2    BY MS. WILL:

3        Q        And this is a recertification dated June

4    18th of 2004 -- or 2014.  And I will note that your

5    physician at that time also indicated that the need

6    for your absence should be a length of approximately

7    three to four hours.

8                Did you provide this to your employer as

9    well?

10       A        Yes.

11       Q        Okay.  And I don't have a copy of the

12   2015 recertification.  So if there are any questions

13   about that, if that has occurred, you know, prior to

14   us obtaining the documents, I'll follow up with you

15   on that when we reconvene over the medicals.

16                But I believe you testified that your

17   most recent recertification resulted in a

18   communication with Mr. Hankerson --

19       A        Yes.

20       Q        -- correct, over a question about the

21   authenticity of the document?

22       A        He stated to me my FMLA is up.  I can't

23   take any more FMLA.

24       Q        Okay.  And who requested that your

25   physician be called?  Did Mr. Hankerson request that

1   the physician be called or did you request that the

2   physician be called?

3        A        Mr. Hankerson called them and told me

4   that they had told -- what they had told him and I

5   requested to call them in front of Mr. Hankerson and

6   Ms. Sarver to verify.

7        Q        Okay.  And what was the topic of the

8   communication that your physician provided during

9   that call?

10       A        The lady told me that she never -- they

11  never told Mr. Hankerson that I filled out the FMLA

12  paperwork myself.

13       Q        And at that time were you taking full

14  days when you called off?

15       A        Yes.

16       Q        Okay.  And your full day absences would

17  be inconsistent with Farkas 9 and Farkas 11, correct?

18                MR. FLANIGAN:  Well, inconsistent how?

19  BY MS. WILL:

20       Q        Well, your physician indicated that the

21  length of your absence would be three to four hours,

22  not eight hours, a full shift?

23       A        For the extensive migraine, but then

24  after that I'm still down because I can't function.

25  They could last up to -- the heaviness of it could

ee09fdf3-f5e1-4af4-a840-a7f956c89535

1    last up to three or four hours.  After that, I'm

2    down.  That's why I said the whole day I'm

3    incapacitated.

4         Q         Okay.  Well, the document speaks for

5    itself, but I read the document to indicate that your

6    doctor has indicated that you would have flare-ups

7    periodically which would limit your ability to

8    perform your job and that it would be medically

9    necessary for you to be absent during the flare-ups

10   and that the frequency of the flare-ups would be one

11   to two times a week and the duration of the flare-up

12   would be three to four hours.

13              MR. FLANIGAN:  And which exhibit is that

14   you're reading from?

15              MS. WILL:  11.

16              MR. FLANIGAN:  Okay.

17              MS. WILL:  As well as 9.

18              MR. FLANIGAN:  We're not challenging

19   what's in those documents.

20              MS. WILL:  Okay.  I have nothing more

21   until we receive the medicals.  Has she signed those?

22              MR. FLANIGAN:  We're going to do it now.

23              MS. WILL:  Okay.  Then we are off the

24   record, reserving two hours.  Thank you.

25              (The deposition was adjourned at 3:08 p.m.)

ee09fdf3-f5e1-4af4-a840-a7f956c89535

(1)

Thursday, Feb. 27, 2014  (2:30 pm)

    I asked Zuliama for my FMLA paperwork for my docte to fill out and she gave it to me.

Monday, March 3, 2014  (9:45 am)

    I brought back my FMLA paperwork to my job and Zuliama (Office Manager) told me I have to hand carry it to Alonzo Hankerson's office (Executive Director of Human Resources)
    She then took me over to his office, and when I arrived she told him I was "handing in FMLA paperwork. Zuliama stayed in his office with us while he read the



EXHIBIT
Farkas
TKR  2  11-9-15

Farkas: 000001

②

forms. He then said "Ok Kadie so you will be taking the next 12 weeks off without pay."

I then stated to Alonzo that my FMLA was intermittent and I never know when my migraines will occur so I can't just take the next 12 weeks off, because some of those days I won't have migraines. My doctor and I are asking for as needed FMLA only take it when I have an episodic flare up

Alonzo then stated that I can't take FMLA as needed, and that I have to take all twelve weeks at once. Then he said I have to make it so I take it all or he does not know if it will be approved.

I didn't understand because in the break room we had FMLA rights posted and the day

Farkas: 000002

(3)

I asked for my paper work I was reading the bulletin board in the break room, and it said on there that FMLA can offer intermittent leave and my doctor also told me so. I explained this to Alonzo, and he looked like he was getting mad at me. He then said why don't you cut your hours to part time since you have a condition that you can't control. I then explained to him that I have to pay my bills, and take care of my family so that is not an option for me. He then told me he will look into how FMLA works and get back to me if I was approved.

I went back to my desk and about 30 min later Alonzo called my extension and asked me to come back to his office.

Farkas: 000003

(16)

was over my AP's (Auto Pays) and my dollar amounts and even hit bonus by Wednesday. She was not trying to hear anything I was saying and the Debt collections Director walked in the room at that time (Charlene Sarver). At this time Charlene sat down and asked what is going on, and I explained to her, and while I was talking Jessie Miles was trying to talk over me so Charlene asked Zuleana and Jessie to leave the room, and we talked by ourselves. When I told Charlene what Jessie Miles has told me she said none of that is correct, and if ~~that is~~ I had any questions to call her on her work cell phone.

My whole thing was if Jessie Miles is giving me the

## Timecard View for Farkas, Jodie (NY7000725)

Thursday, July 03, 2014 01:30 PM

| | |
|---|---|
| **Timecard Date Range:** | Last Month (06/01/2014 - 06/30/2014) |
| **Supervisor:** | Rivera, Jacqueline |
| **File Number:** | 000725 |
| **Company Code:** | **NY7** |

### Hours Summary

| Earnings Code | Hours |
|---|---|
| Vacation | 16.00 |
| Bereavement | 8.00 |
| Regular | 106.00 |
| **Total:** | **130.00** |



EXHIBIT
Farkas
TKB   6   11-19-15

### Timecard Details

| Date | Time | Hours | Daily Totals | Out Type | Earnings Code | Department |
|---|---|---|---|---|---|---|
| 06/02/2014 | 07:54 AM - 10:02 AM | 2.00 | | | | 202575 |
| 06/02/2014 | 10:16 AM - 12:01 PM | 2.00 | | | | 202575 |
| 06/02/2014 | 12:30 PM - 03:02 PM | 2.50 | | | | 202575 |
| 06/02/2014 | 03:17 PM - 04:30 PM | 1.50 | 8.00 | | | 202575 |
| 06/03/2014 | 12:00 AM - 12:00 AM | 0.00 | 0.00 | | ABSENT | 202575 |
| 06/04/2014 | 07:53 AM - 10:04 AM | 2.00 | | | | 202575 |
| 06/04/2014 | 10:16 AM - 12:02 PM | 2.00 | | | | 202575 |
| 06/04/2014 | 12:28 PM - 03:10 PM | 2.75 | | | | 202575 |
| 06/04/2014 | 03:21 PM - 04:30 PM | 1.25 | 8.00 | | | 202575 |
| 06/05/2014 | 12:00 AM - 08:00 AM | 8.00 | 8.00 | | BEREAV | 202575 |
| 06/06/2014 | 12:00 AM - 08:00 AM | 8.00 | 8.00 | | VACATION | 202575 |
| 06/09/2014 | 12:00 AM - 12:00 AM | 0.00 | 0.00 | | ABSENT | 202575 |
| 06/10/2014 | 11:53 AM - 02:01 PM | 2.00 | | | | 202575 |
| 06/10/2014 | 02:16 PM - 04:04 PM | 2.00 | | | | 202575 |
| 06/10/2014 | 04:32 PM - 06:01 PM | 1.50 | | | | 202575 |
| 06/10/2014 | 06:17 PM - 08:31 PM | 2.25 | 7.75 | | | 202575 |
| 06/11/2014 | 07:59 AM - 10:01 AM | 2.00 | | | | 202575 |
| 06/11/2014 | 10:15 AM - 12:01 PM | 2.00 | | | | 202575 |
| 06/11/2014 | 12:29 PM - 03:01 PM | 2.50 | | | | 202575 |
| 06/11/2014 | 03:16 PM - 04:31 PM | 1.50 | 8.00 | | | 202575 |
| 06/12/2014 | 11:57 AM - 02:02 PM | 2.00 | | | | 202575 |
| 06/12/2014 | 02:18 PM - 04:02 PM | 1.75 | 3.75 | | | 202575 |
| 06/13/2014 | 12:00 AM - 12:00 AM | 0.00 | 0.00 | | ABSENT | 202575 |
| 06/16/2014 | 07:54 AM - 10:01 AM | 2.00 | | | | 202575 |
| 06/16/2014 | 10:17 AM - 12:01 PM | 1.75 | | | | 202575 |
| 06/16/2014 | 12:32 PM - 03:01 PM | 2.50 | | | | 202575 |
| 06/16/2014 | 03:15 PM - 04:31 PM | 1.50 | 7.75 | | | 202575 |
| 06/17/2014 | 11:51 AM - 02:04 PM | 2.25 | | | | 202575 |
| 06/17/2014 | 02:18 PM - 04:01 PM | 2.00 | | | | 202575 |
| 06/17/2014 | 04:32 PM - 06:01 PM | 1.50 | | | | 202575 |

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JODIE FARKAS, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 1:15-CV-00356-CCC |
| NRA GROUP, LLC, individually | : | |
| and d/b/a NATIONAL RECOVERY | : | |
| AGENCY (NRA), ZULIAMA | : | |
| FIGUEROA, ALONZO | : | |
| HANKERSON, JESSIE MILES, | : | |
| CRAIG ANDRUS, and | : | JURY TRIAL DEMANDED |
| CHARLENE SARVER, | : | |
| Defendants | : | |

## AFFIDAVIT OF ASHLEY CHILLE

Ashley Chille, Esq., pursuant to 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury, states the following:

1.     I am a licensed Pennsylvania attorney and serve as the Director of Legal and Compliance for Defendant NRA Group, LLC ("NRA").

2.     Jodie Farkas ("Ms. Farkas") was hired by NRA on March 4, 2013 as a debt collector and has worked continuously in that position through the date of this Affidavit.

3.     During all times relevant to Ms. Farkas' Complaint, Alonzo Hankerson served as NRA's Director of Human Resources.

4.     During all times relevant to Ms. Farkas' Complaint, Craig Andrus served as NRA's Training Manager.

5.      During all times relevant to Ms. Farkas' Complaint, Charlene Sarver

served as NRA's Assistant Director of Dialer & Collections.

6.      All employees of NRA are required to comply with the Fair Debt

Collection Practices Act ("FDCPA").

7.      In my role as Director of Legal and Compliance, I review recordings

of debt collector phone calls when consumers make complaints regarding

particular phone calls.

8.      On April 15, 2014, I was informed that a consumer made a Complaint

about a conversation he had with Ms. Farkas on March 17, 2014.

9.      I listened to the 16 minute and 9 second phone call between Ms.

Farkas and the consumer that took place on March 17, 2014.[1]

10.     The following is an accurate and true excerpt of the conversation that

I heard between Ms. Farkas and the Consumer:

*1:27*

**Consumer**: The reason I am calling you, ma'am, is I want to make, I
want to know if I make payments on this bill to you, biweekly
payments, will that keep this from showing up on my credit report?

---

[1] The audio recordings referred to herein contain confidential personal and
financial information about the consumer and have not been produced with this
Affidavit. Plaintiff never served discovery requests upon any of the Defendants
and, as such, these audio recordings were not produced during the discovery phase
of this litigation. If the Court believes that a review of these audio recordings will
be helpful or necessary to its review of Defendants' Motion for Summary
Judgment, the audio recordings can be made available to the Court *in camera*.

...

*2:08*

**Ms. Farkas:** Well I just checked and it has never been reported to the credit bureau.

**Consumer:** Great. So I want to keep it that way.

**Ms. Farkas:** Right.

**Consumer:** So if I make you biweekly payments, I get paid every two weeks, if I make payments every two weeks, will that keep it from going to that next step?

**Ms. Farkas:** Well, once you make a valid payment arrangement through a checking or a savings account . . . and then you would be able to be in good standing with the client. And it's never been reported so once you make a payment arrangement you will be in good standing.

**Consumer:** OK. Let's do it.

...

*4:18*

**Consumer:** I just want to keep this from going to my credit. I just got my credit cleaned up, ma'am, and I don't want to mess it up again. I'm sure you can understand that.

**Ms. Farkas:** I do understand that. The only thing is company policy is to set it up, you have to set up through a valid checking or savings account in order to [interrupted]

**Consumer:** OK. OK. Whatever it's gonna take, ma'am. I just don't want to screw up my credit again. OK. . . . I'm not trying to give you a hard time. I am just trying to understand your policy.

...

*7:18*

**Consumer:** March 28. OK. Can I make my first payment then and keep this from going to the credit bureau?

**Ms. Farkas:** You can make it March 28. Uh hum.

**Consumer:** And this will keep it and we'll be in good standing as long as I make my payments . . . I'm trying to buy a house, ma'am, and I can't mess up my credit again. I mean, I owe this bill and I do want to take care of it. If I make you a payment on March the 28th for twenty five dollars and continue to make you payments every two weeks, this will keep it from going to the credit bureau, is that correct?

**Ms. Farkas:** This will keep it in good standing, Sir.

*9:12*

...

**Consumer:** Whatever you need to do, I just want to take care of this bill and be in good standing with your company.

11.     Based on NRA's review of the phone call, we concluded that:

   a.     Throughout the phone call, the consumer repeatedly stated that his primary goal was preventing his delinquent account from impacting his credit report.

   b.     Ms. Farkas led the consumer to believe that his delinquent account would not be reported to the credit bureau if the consumer set up a payment arrangement through his checking account.

12.     A valid payment arrangement does not keep a consumer from having their account reported to the credit bureau.

13.     On January 3, 2014, all employees were notified in breakout sessions and via e-mail that setting up payment arrangements will not stop an account from being reported to the credit bureau.

14.     NRA concluded that Ms. Farkas' misleading statements to the consumer in the phone call of March 17, 2014 were a violation of the FDCPA.

15.     On April 30, 2014, I was informed that the relative of a deceased consumer made a Complaint about a conversation she had with Ms. Farkas on April 26, 2014.

16.     A review of that phone call led NRA to conclude that Ms. Farkas did not follow proper procedures for handling a deceased consumer's account.

17.     Craig Andrus was on FMLA leave and then an extended leave of absence from February 20, 2015 through August 3, 2015.

18.     During all times relevant to Ms. Farkas' Complaint, Craig Andrus did not have the power to hire or fire employees.

19.     During all times relevant to Ms. Farkas' Complaint, Craig Andrus had no role in tracking employee attendance, disciplining employees, or administering NRA's FMLA policy.

I further state under penalty of perjury that the foregoing is true and correct.

Ashley Chille, Esq.
PA Bar ID: 306865

Executed on: _January 15th, 2016_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
EMMA G GOODYEAR
Notary Public
SWATARA TWP, DAUPHIN COUNTY
My Commission Expires May 1, 2017

County of Dauphin
State of Pennsylvania
Emma G Goodyear     expires 05/01/2017

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on this date a true and correct copy of the foregoing document was served upon the following attorney for Plaintiff under the ECF Guidelines of this Court:

Patrick Flanigan, Esq.
Law Office of Patrick Flanigan
P.O. Box 42, Swarthmore, PA 19081-0042
pat@lawofficepf.com

Date:  January 15, 2016                    */s/ Lee E. Tankle*
                                                   Lee E. Tankle